## MARY MONROE v. THE STATE.

If the exculpatory testimony, relied on by a defendant, to rebut a *primâ facie* case of guilt, established by the state, from its intrinsic weight, consistency, or probability, be such as to make it incredible; if it conflict with facts clearly established, implicating the defendant in the crime charged; and other circumstances, subject it properly to suspicion; and the jury, in determining upon the credibility of the witnesses, disregard it, and find the defendant guilty, it is not error to refuse a new trial.

Where the court had properly instructed the jury, as to the character of the doubt, that should acquit the defendant altogether; and also, as to what would reduce the homicide from murder in the first, to murder in the second degree, and as to the elements of each; and then charged them, that, "if, then, they were satisfied, from the proof, that the accused was guilty of murder in the first degree, they should simply say so; but if they believed otherwise, or were not satisfied, beyond a reasonable doubt, that she was guilty of murder in the first degree, then they should find her guilty of murder in the second degree, and proceed to assess the penalty," &c.: *Held*, That the charge was not calculated to mislead the jury, by inducing the belief, that they were bound to find the defendant guilty of murder in the second degree; or that the doubts, to the benefits of which the defendant was entitled, should, by them, be applied with less force to the one grade of the offence, than to the other.

A juror, on his *voir dire*, stated that, from hearing a part of the evidence before the examining court, he had formed a partial opinion as to the guilt or innocence of the accused, which, though it *might*, to some extent, he did not think would, influence his verdict; and further stated, that he had no fixed opinion in the case, that would influence his verdict.; on a challenge for cause, the court adjudged the juror competent: *Held*, That there was no error: the juror had not formed such an opinion, as that the court could adjudge him disqualified. (Code Crim. Proc., Art. 579.)

That a juror entertained a bad opinion, in general, of the defendant, which he expressed, is not, necessarily, a ground of disqualification: tuch less, will such an expression, made jocularly, before the trial, and not in reference to the case on which the defendant is to be tried, disqualify him.

APPEAL from Harris. Tried below before the Hon. Peter W. Gray.

This was an indictment against the appellant, charging her, in four several counts, with the murder of Mary Abigail Heady, on the 11th of August, 1858.

The first count charged the murder to have been committed,

by administering a poison, called cobalt; the second, by strangling with a cloth, tied around the neck of the deceased; the third, by throttling the deceased, and choking her to death; and the fourth, by means unknown to the grand jury.

On the trial of the case, at the Fall Term, 1858, George White, one of the regular jurors, was examined, touching his qualification, and was, by the defendant, challenged for cause. The juror stated, on his *voir dire*, that he had heard a part of the evidence before the examining court, and had formed a partial opinion on it, as to the guilt or innocence of the accused, but did not think it would influence his verdict. On being asked, "if it would do so to any extent?" he replied: "it might." To further questions, he said, he had no fixed opinion on the case, that would influence his verdict. On objection, by the defendant, that he had said, his opinion *might* influence him, the court ruled him competent. Being further interrogated, the juror answered, that he had formed a partial opinion, but had no fixed opinion at that time, which could influence his verdict; that it might be influenced by the partial opinion, he had formed, but he thought not. The objection being renewed, the court ruled as before; whereupon, the defendant challenged him peremptorily, and excepted to the ruling. In reply to a question from the court, the juror said, that he was properly understood as saying, "that he had no established opinion as to the guilt or innocence of the accused, at that time."

The deceased, was a girl aged about sixteen or seventeen years, whom a Dr. Monroe, (the husband of the defendant,) brought to Texas, from Baltimore, during that summer, (1858,) claiming her as his niece, and she, recognising him as her uncle. He took her to his residence, where she died. The deceased had been at the defendant's house but a few weeks, before she began to treat the girl with great harshness, rudeness and severity. It appeared, that the defendant was jealous of the girl, suspected an improper intimacy with her husband, and accused her of a want of virtue; it was proved by one of the witnesses, that she was violently opposed to a matrimonial engagement, which she stated

to exist between her son, (by a former marriage,) William Stanley, and the deceased. Speaking on that subject to the witness, (Mrs. Graham,) she told her, that she would rather plunge a dagger to the girl's heart, than acknowledge her as a relation. This remark she had been heard to make three several times.

For several months before the death of the deceased, the defendant pursued a course of constant abuse towards the girl, rarely speaking kindly to her, and as stated by Mrs. Graham, using violence upon her person, by slapping her in the face, and on one occasion, whipping her with switches. She expressed the opinion to Mrs. Graham that she was not the niece of her husband, but an imposter; that she was of that opinion the first evening she saw her. She expressed the wish to Mrs. Graham, several times, that Abby (as the deceased was commonly called) would die, or was dead. On the day that Abby was buried, the defendant said, she was glad she was dead; the reason assigned by her, was, that she was out of her way, and now, she could have some peace. Mrs. Graham further testified, that the defendant showed no feeling of sorrow after the burial, sang very merrily, and said she was glad she was dead.

This witness had been residing in the family, for about four months preceding the death, and on the Sunday previous, left there, "because of the trouble going on; there had been threats made; did not know what might turn up, and did not wish to be there. Was afraid that something was going to happen, and did not know, but what we might all be poisoned; was afraid the defendant might do it." The witness stated, that the defendant came to see her on Tuesday after she left, and wished her to return; she objected, but the defendant said, that if she would go back, she would guaranty that Abby should not bother her any more. (The witness stated, also, that Abby had never troubled her.) The defendant, several times said to the deceased, that if she was in her place, she would kill or destroy herself in some way. The girl was simple-minded, weak, timid, and very affectionate; she stood in great fear of the defendant. She had no relations, nor other home in this country.

There was testimony (Mrs. Graham's) to show that the deceased wished to leave there a great many times, but the defendant would not allow it, because the deceased might spread reports against her.   There was rebutting testimony tending to show that the deceased had expressed kind feelings, and those of gratitude towards the defendant, for kindness received from her, and of her refusal or unwillingness to leave her.   It was proved also, that, by promises of forgiveness and protection, the defendant obtained from the deceased, a confession, that she had had criminal intercourse with Dr. Monroe ; after which her treatment was much worse.   She charged her with being pregnant. After the death, on the evening of the burial, Mrs. Graham heard a whispered conversation between the defendant and her husband, as to what should be written to the friends of Abby, at the north, about her death.   The defendant suggested, to write them that she died of whooping cough, or yellow fever.   He replied that he left it all to her.

It was proved, that the defendant brought cobalt to the house, a month before the death of the deceased.   There had been some conversation before it was brought there, in reference to the use of cobalt for killing flies.   The witness, (Mrs. Graham,) saw Abby with it twice—the first time she had it, was ten days before her death, and the second time, on the Sunday preceding it.   She asked the witness if it was poison ; the witness told her to read for herself; that she would not like to try it.   The witness heard the deceased say, that she would take anything that would poison her, if her aunt would get it for her.   The defendant had spoken of sending the deceased away, but the latter threatened to expose her treatment of her, which led the defendant to change her mind.   About a month or more before the death of the deceased, the defendant took poison, or something which she called poison, which made her very sick, and she said to the witness, (Mrs. Graham,) that she had rather be dead, than live as things were going on ; she talked about poisoning herself, and insinuated, "that she would poison all; her husband and all." The reason given for taking the poison, (if such it was,) was,

"that she was miserable about her husband's and Abby's con-
duct." The defendant stated to Mrs. Graham, that she died
about eight o'clock on Wednesday evening, of the 11th day of
August, 1858.

William Purvis testified, that about sundown of the day last
named, while at his home, which was distant from the defendant's
house two or three hundred yards, he heard, what he took to be
the defendant whipping a young woman at her house. Had
heard the same there on previous occasions, several times. This
whipping lasted ten minutes; heard the screams of some one,
and the defendant talking to her. Looked over there, but could
not see them, as they were concealed somewhere. The voice
cried out, "Oh, ma'am, let me alone! I tell ye I won't!" which
was repeated a number of times. Heard the defendant's voice;
she repeatedly called the young woman, "a nasty, stinking, little
bitch;" and that she would make her do something, the witness
did not understand what. The witness had known the defendant
since 1839, and was acquainted with her voice. Heard a whip-
ping take place over there, a week or ten days before that; from
the voices, took it to be the defendant whipping the girl. Heard
the young woman's voice crying for mercy, or crying to be let
alone, a number of times. Also heard another whipping, three
or four nights before the death of the young woman; on all these
occasions recognised the defendant's voice, and heard the
screams of the same voice. The two occurrences last referred
to, happened after dark. Had heard similar disturbances over
there frequently; but heard none before the girl came there,
nor since her death.

· It was proved by another neighbor, who lived about eighty
yards from the defendant, that about an hour before sundown, of
the day of her death, while in his field, he heard the screaming
of a voice he did not recognise, as if being punished, and as if a
cry of distress. It was the voice of a woman. Could not hear
distinctly what was said; heard only one voice.

Information was first given of the girl's death on the 12th day
of August, the morning succeeding her death; on which day,

she was buried.    The defendant lived two miles from the city of Houston.    No physician was called to see the deceased.    The defendant's husband, O. B. Monroe, was not a physician, though called "Doctor."    He had been a wood-chopper on the bayou; was fifty or sixty years of age.    On the 13th day of August, the day after the burial, the body was disinterred, and a coroner's inquest held.

Coombs, (a witness on behalf of defendant,) stated that he saw the deceased after death, when she was put in the coffin; did not examine the body particularly, but saw that the lower part of her face was purple.

The examination of the body, at the coroner's inquest, was made by Dr. Vasmer, and Dr. Seigismund, who stated that there was a marked discoloration of the skin, a remarkable lividity commencing above the collar bone, and extending over the neck and head.    The face was somewhat swollen, a bloody froth was oozing from the mouth and nose, the pupils of the eyes dilated, the lungs very much congested, but otherwise healthy, and the heart apparently healthy, the right cavity extended.    In the stomach was found one-half ounce of cobalt, in a crystalline state, with sharp corners; one piece of which was fifteen or sixteen grains.    The womb presented nothing abnormal, was apparently healthy, and of the ordinary size of that of a virgin.    There was nothing in its appearance, to justify a belief that she had had sexual intercourse.    On the back, over the shoulder blades, the skin appeared indurated; and several livid places on the back, with a little abrasion of the skin, which looked like cuts or strokes with a whip, from their appearance, were caused before death, probably a day or two.

Dr. Vasmer thought it impossible, from the size, hardness, angular sharp corners, and crystalline shape of the cobalt, that it could have been voluntarily swallowed; could not conceive how it was possible.    Dr. Seigismund said "he did not know she could swallow it."

The physicians expressed a positive and decided opinion, that the deceased died from strangulation, caused probably by the

use of a handkerchief or cloth tied around the neck, and not from the effects of the poison, which, nevertheless, would itself have proved fatal. The reasons and illustrations on which they based this opinion, embraced long and learned dissertations and explanations, applicable to the condition and appearance of the body, a critical examination of the stomach and other organs, with the substances contained therein, the nature and effects of poisons, and of strangulation.

Several other physicians were examined, who had not been present at the *post mortem* examination. From the opinions of all the physicians, it appeared, that from the symptoms which usually occur in cases of strangulation, and would be manifested after death, the deceased might have come to her death from that cause. The symptoms were such as attended cases of that kind. The opinions of some of the physicians, based upon hypothetical cases presented to them, tended to establish the fact that the death might have been produced by the effects of poison, and not conclusively from strangulation. The testimony of Dr. Ashbel Smith, Dr. Howard, and others, was given at length, and contained much abstract learning touching the tests which determine the causes of death by poison or strangulation. From the whole testimony, it appeared, that the results of the examination of the body, exhibited the general symptoms of death by strangulation, and none which conclusively led to a different opinion.

On the morning of the 12th of August, a Mr. George, a connexion of the defendant, (probably a son-in-law, as may be inferred,) went to Dr. Fisher, and asked him to go and *see a patient;* just before arriving at the defendant's house, George told him that he believed the girl *died* from violence; that he had been told she died from whooping cough. Dr. Fisher knew of no suspicions until then; he reproved George for his ungentlemanly treatment, in not having told him the facts in the first instance. The sexton was closing the lid of the coffin, when he went in. Dr. Fisher glanced casually at the body, after turning down the clothing. The only discoloration he noticed, was a mark across the throat, of the width of three-eighths of an inch

to one-half inch, at the widest part, and running down to a point.

There had been a coroner's inquest held on the body, on the morning after the death, before burial; the inquest heretofore referred to was the second, and had after interment, as before stated.

On the occasion of the last inquest, the conduct of the defendant, as well as that of her husband, was very suspicious; exhibiting great anxiety and alarm, manifested by acts and conversations of both, and the flight of the latter. They endeavored to persuade those officiating for the purpose of the inquest, that a disinterment was wholly unnecessary; the defendant stated that the deceased was not virtuous, was three months gone in pregnancy, and had committed suicide by poison, to hide her shame. She appealed ineffectually to Mrs. Graham, who was present, to show that she had been kind to the girl. She appealed to Mrs. Graham, "to help her," saying at the time, that she could if she would, and if she did, "she would help her." She appealed to one of the jurors of the inquest, "to help her."

The defendant introduced, as a witness, her son, Larkin B. Sweeny, commonly called "Ben," a boy about fourteen years old. He stated that the deceased, on the day of her death, about noon, and before dinner, was vomiting; he asked her what was the matter; to which she replied, that she had taken poison; the reason given by her was, that she had disgraced herself, and did not want to live. After he found out she had taken the poison, she was sick, and well again, walking about. She looked sick and pale; his mother asked her, what was the matter, she said, "nothing;" his mother said, "she knew better, she was sick," and then she admitted having taken poison. His playmate, Lewis Stiles, a boy of his own age, was with him spending the day; he said nothing to him about the matter. "Abby told ma, that she got the poison out of a red box—ma told her to do so." The poison was cobalt, or fly poison. He stated, that the deceased vomited up black lumps, which were soft, of the color of the contents of the box; that a chicken ate of it, and died within an hour; did not before state about the chicken

eating the lump, to Lewis; (and as far as appeared from the testimony, had not stated it on any other occasion,—this statement was made on cross-examination.)   After dark, he went half a mile with Lewis, on his way home; on cross-examination, he said, he went "a piece;" one-fourth of a mile and back, "that made a half mile."   Again said, he might have gone a half mile with Lewis; "but was not out of hearing of the house."

The witness detailed the efforts of Dr. Monroe, and the defendant, to afford relief to the deceased, by emetics, "salt and water," and poultices; and that the defendant wished to send for a physician, but Monroe objected, saying, that he could do as well as any doctor.   The witness said, that his mother wept, and showed as much feeling as if the deceased had been her child. That the distance from his mother's residence to that of Purvis was 350 yards; had never measured it.   There was no screaming, nor any such exclamations at home, on the occasion, as described by Purvis.  But he got pepper in his eyes, and "hollered," when mixing pepper and brandy, at the request of his mother, to rub the deceased.   That the defendant had never, to his knowledge, whipped the deceased; she had once slapped her for swearing.   He saw no violence offered to Abby, on the evening of her death.   Saw her after death, but saw no marks upon her neck.   He stated, that Abby confessed, in his presence, that she had slept with Dr. Monroe on ship-board, on their way to Texas; he had seen her kiss him at night, several times.   The confession was made a month after she came there.   That she had been to bed to a young man, (William Stanley,) after which Monroe treated her very badly.

On cross-examination, this witness stated, that he did not tell Dr. Smoot that he was a smart boy of his age; but told him that "not many boys, of his age, had seen as much trouble as he had."

Dr. Smoot proved, that at the examination before the jury of inquest, Sweeny was sworn, and after testifying, in a conversation with the witness, (which the boy introduced by making inquiry of him, as to his opinion, whether the case was a serious

one against his mother,) speaking of his own evidence, said in a triumphant manner, he thought there were but few boys of his age equal to him.

Daniel Coombs, a witness for the defendant, stated, that he was living with the defendant; was employed by her to work on the farm, and drive her team. On cross-examination, he stated, that he could neither read nor write; and that he did not know the consequences of making a false statement; thought it would be wrong. The testimony of Coombs was confirmatory of Sweeny's statements, in respect to the time and manner of the death; ignorance as to violence or punishment being used on the evening and day of the death of deceased. He said that he saw her go to the room of William Stanley, and made some statements tending to confirm the testimony impeaching her virtue; but not more direct or positive than the other testimony given by Sweeny.

He stated, that Lewis Stiles left the house of the defendant, for his home, about sundown, and Sweeny was at the stable when Lewis started, and did not go with him. Knew nothing of any brandy there, that night; never had seen brandy there. Never heard of a chicken eating anything vomited by the deceased, and dying in consequence. The matter had been frequently talked about in the family, by the defendant, Sweeny, Stanley, and the witness. Never knew the defendant to whip or box the deceased; nor heard of her being slapped or whipped. In reply to a question, on cross-examination, the witness answered, "Yes, I told Mr. Tom Hailey, that if the girl was not removed, she would be killed." He proceeded to explain, by saying, that his meaning was, that she would grieve herself to death. Heard no screams, as described by Purvis; the noise made by the boy Sweeny, when he got pepper in his eyes, was all he heard. Stated that Purvis' was 500 or 600 yards from defendant's. Had never seen anything in the conduct of the defendant and her husband, to make him think they would kill her. About the close of his testimony, he stated, that he did not notice when Lewis Stiles left, or who went away with him. The witness said, he was twenty-two years of age. He was standing

by the side of the deceased, when she vomited the black lumps; did not see Ben, (Sweeny,) and did not know where Ben was, when he was looking at the lumps. The witness did not see the salt and water given as an emetic, as stated by Sweeny.

The presiding judge gave a full and explicit charge, and among other matters, instructed the jury, that "if, considering all the facts proved to their satisfaction, they were not satisfied, beyond a reasonable doubt, that the accused, or some one else, acting with her, and in her presence; or by her instigation, or with her knowledge and consent, in her presence; did kill the deceased by any of the means specified in the indictment, or by violence to her person unknown, then, they would find her not guilty. But, in order to find against the accused, they ought to be satisfied, as had been repeatedly said, beyond a reasonable doubt, that is, such a doubt as fairly and naturally presented itself, from the facts which they believed to be true. The rule was, that all the material facts, which they believed, should lead to the conclusion, that the accused was guilty of the act, in such manner, that they could not reasonably believe that the deceased killed herself, or that some other person killed her, without the agency or participation of the accused."

The court proceeded to charge the jury, as to what state of facts, if proved to their satisfaction, would constitute the killing of the deceased, murder; and that, if they were so satisfied, they would next inquire, as to whether it was murder in the first, or second degree, and defined the state of facts under the testimony, under which it might be the one, or the other. Then followed the charge referred to in the opinion, and set out in the brief of the counsel for the appellant as objectionable, because calculated to mislead the jury into the belief, that they were instructed to find the defendant guilty of murder in the second degree, viz. :

" If, then, you are satisfied, from the proof, that the accused is guilty of murder in the first degree, you will simply say so ; but if you believe otherwise, or are not satisfied, beyond a reasonable doubt, that she is guilty of murder in the first degree, then, you will find her guilty of murder in the second degree,

and proceed to assess the penalty, at not less than five years' confinement in the penitentiary."

The jury found the defendant guilty of murder in the second degree, and assessed the punishment at six years' imprisonment in the penitentiary.

The defendant filed a motion for new trial, for the following causes :—1. Because the court erred in its ruling upon the competency of White, as a juror.   2. Because the court erred in its charge to the jury.   3. Because the verdict was contrary to the law, and the evidence.   4. Because the verdict was contrary to the charge of the court.   5. Because the defendant did not receive a fair and an impartial trial.   6. Because the verdict was decided by lot, and was not, in fact, a fair expression of opinion by the jurors.   7. Because two of the jurors had formed, and expressed an opinion, adverse to the defendant in this case, before being empannelled, which fact was, at the time, unknown to the defendant.   8. Because the jury misunderstood, and were misled by, the charge of the court.

In support of the sixth ground of the motion, a bill of exceptions, taken by the defendant, presented the following facts : When the motion for a new trial came on to be heard, the defendant introduced, as a witness, Robert P. Boyce, one of the jurors, who testified, that when the jury retired to consider of their verdict, after reading over the charge, in part, the first question asked, was, whether each juror had made up his mind as to the guilt or innocence of the accused ?   The answer was "yes," without stating the conclusion of any one of them.   It was then suggested, in order to ascertain how they stood, that each should write his opinion, and put it in a hat, without stating which juror entertained such opinion, with the object that no juror should be influenced, in his opinion, by what any other thought.   Two of the jurors being unable to write, the mode of expressing the opinion agreed on was, that each should make marks on a paper, or leave it blank.  A blank, signified acquittal; two marks, guilty of murder in the first degree; and one mark, guilty of murder in the second degree.   The result indicated

that two were in favor of acquittal, two in favor of a verdict of guilty of murder in the first degree, and eight in favor of a verdict of guilty of murder in the second degree. This process was repeated, without any juror expressing to the others what was his opinion, until the fifth or sixth ballot, when it stood one juror in favor of acquittal, one in favor of a verdict of guilty of murder in the first degree, and the others in favor of a conviction of murder in the second degree. About this time, the charge was again referred to, and a part of it read, but not entirely through, and the balloting repeated, by the same process as before; the result was, one juror in favor of acquittal, and all the others for conviction of murder in the second degree. After several more ballots, the charge was again read entirely through, and statements were made by different jurors, as to their understanding of the testimony of different witnesses, and, after canvassing the charge and the testimony for some time, still without the expression by any juror of his opinion, otherwise than as described, and without a discussion of the penalty, the tenth ballot was taken by the process before mentioned, which resulted in the verdict of guilty of murder in the second degree. They then proceeded to assess the penalty. No average was agreed on, but each expressed his opinion as to the penalty. Some were in favor of confinement in the penitentiary for five years, others for seven, and others for other periods, up to fifteen or twenty years. They finally agreed on six years, and so returned their verdict and assessment of penalty.

In support of the seventh ground of the motion for a new trial, on the hearing thereof, the defendant proved that Dunn, one of the jurors, several days before the trial of the case, made to him the remark quoted in the opinion. The remark was made under the following circumstances: the witness Lee, was in company with Dunn and Littlefield, when the defendant passed along; the witness said to Dunn, in a joke, or light way, that " he thought she ought to be hung." To which Dunn replied, "yes, she ought to have been hung twenty years ago." They were not conversing of this case; it was a jocular conversation.

The motion for a new trial was overruled, and judgment entered upon the verdict. The defendant gave notice of an appeal, and sentence was suspended, to await the decision of the Supreme Court. The grounds of error assigned, were all involved in the ruling on the motion.

*Henderson & Johnstone*, for the appellant.—Argued, that all the facts and circumstances deposed to by the witnesses for the state, and the legitimate conclusions, tested by the rules of the law of evidence, were insufficient to sustain the verdict of the jury, or to connect the appellant as the criminal agent, in procuring the death of the deceased, in any manner whatever. They cited Burrill on Circumstantial Evidence, 737, where it is laid down, "That the evidence against the accused must be such, as to exclude, to a moral certainty, every hypothesis, but that of the guilt of the offence imputed to him." (1 Stark. on Ev. 514.) They contended, that the opinion of the witness, Dr. Vasmer, that the deceased died from strangulation, produced with some soft substance compressing the neck, was erroneous, (cited Taylor on Med. Jurisprudence, 46, 47, 78, 79, 91, 92, 509,) and urged, that these medical authorities were sustained by common observation in all ages, as illustrated by Shakspeare, in the play of Henry VI., act 3d, scene 2d.

> "But see! his face is black and full of blood,
> His eyeballs further out, than when he lived,
> Staring full ghastly, like a strangled man;
> His hair upreared, his nostrils stretched with struggling;
> His hands abroad displayed, as one that grasped
> And tugged for life, and was by strength subdued.
> Look on the sheets! his hair you see is sticking;
> His well proportioned beard, made rough and rugged,
> Like to the summer's corn, by tempest lodged."

That the body of the deceased, did not present the external indications of strangulation, which the medical works referred to, laid down as the ordinary appearances of death from that cause; and that those presented by the body, were not incompatible with a case of death produced by poison.

They argued that the charge of the court was calculated to mislead the jury; that from the portion of it, in which they were instructed, that if they were not satisfied that defendant was guilty of murder in the first degree, they would find her guilty of murder in the second degree, &c., such minds, as juries are composed of, would conclude that they were bound to find her guilty of murder in the second degree, though a different construction, from the whole charge, would be clear and obvious to a legal mind. "And if the judge undertook, in his written charge, to speak of murder in the second degree, he should have so framed his charge, that it was not calculated to mislead the jury in finding their verdict, in that degree, and to have impressed on the jury, in that connection, as he did in murder in the first degree, that she was entitled to any reasonable doubt, arising in the minds of the jury."

That the testimony justified a conviction of murder in the first degree, if of any degree, and not of murder in the second degree. That the jury must have had reasonable doubts, and instead of acquitting, "they compromised between their duty, and a degree of punishment, which, if she was guilty at all, was inadequate to the enormity of the crime." (Cited Pilkinton v. The State, 19 Texas Rep. 214.)

*Cone & Goldthwaite*, also for the appellant.—The third ground on the motion for a new trial was, "Because the verdict is contrary to the law and the evidence."

The circumstances proved upon the trial in the court below, are not sufficient to sustain the verdict. There is no principle of law, more clearly and universally recognised, than that laid down by Mr. Starkie, vol. 1, p. 574, that "it is essential that the circumstances should, to a moral certainty, actually exclude every hypothesis but the one proposed to be proved." And the same principle is also expressed by Mr. Wills, in his Treatise upon Circumstantial Evidence, p. 149, in the following language: "In order to justify the inference of legal guilt from circumstantial evidence, the existence of the exculpatory facts, must

be absolutely incompatible with the innocence of the accused, and incapable of explanation upon any other reasonable hypothesis than that of his guilt."

From the conflicting testimony of the physicians upon the trial, as to the real cause of the death of deceased, and particularly upon the evidence of poisoning and strangulation, both internal and external, the most *reasonable hypothesis* would seem to be, that the deceased died from the effects of the poison found in her stomach, upon the *post mortem* examination. The *reasonable doubt* was evidently awakened in the minds of the jury, as to the guilt of the prisoner; but instead of acting upon the "crowning rule" of all the others, applicable to circumstantial evidence, that, "in cases of doubt, it is better to acquit than condemn," they seem to have given the benefit of the doubt to the prisoner, in the very mild verdict they gave in a case, when so atrocious an offence was charged.

The preponderance of the testimony in the case, was clearly that the deceased died from the effects of cobalt, 240 grains of which were found in her stomach. The physicians making the *post mortem* examination, both conjecture how long the poison had been in the stomach of deceased, before her death, but admit that it is impossible to say, with certainty, anything about it. These opinions were based upon the inflammatory condition of the stomach, which they did not think sufficient to warrant the conclusion, that the poison killed her. Other physicians testified to the fact, that it cannot be told, even conjecturally, whether death resulted from poison, simply from the appearance of the stomach alone. The testimony of Doctors Vasmer and Seigismund, is based entirely upon their examination of the body, three days after death, and cannot, of course, be so conclusive as to the *external* appearances, as those who saw the body soon after death, or before the burial. The following authorities sustain the opinions of those testifying adversely to Vasmer and Seigismund. (Taylor's Medical Jurisprudence, 79, as to inflammation; Wharton & Stille, 421, as to inflammation; Taylor on Poisons, 259, as to the uncertainty of the length of time the deceased had

been taking the cobalt; Taylor on Poisons, 492, Wharton &
Stille, 612, and Beck on Poisons, 574, as to the evidence of
strangulation; Taylor, 495, as to the internal and external
evidences of hanging or strangulation; Beck, 747, as to *post
mortem* appearances of lungs and heart, from poisoning; Tay-
lor on Poisons, as to the appearance of bloody froth in cases of
poisoning by arsenic.)

*Attorney-General*, for the appellee.—The briefs filed by the
counsel for the appellant, furnish a sufficient history of the case.
The first ground to be noticed, on which appellant seeks to re-
verse the jugdment, is, that the court erred in the charge to the
jury. If the portion of the charge objected to, were considered
in the abstract, there might be some force in the objection, but
taken in connexion with the context, it is free from objection.
No charge could be sustained, if each part had to be considered
separate and apart from every other; and no jury, not crimi-
nally regardless of duty, would look exclusively to a single para-
graph in a charge, to ascertain the law governing the case.

The court repeatedly charged the jury, that in determining
the question of guilt, they should give the accused the benefit
of every reasonable doubt. But that after having satisfied them-
selves, beyond a reasonable doubt, of her guilt, that they should
then determine whether she was guilty of murder, and if so,
whether it was murder in the first or second degree. The jury
are next instructed as to the circumstances that would constitute
murder in the first degree, and the kind of verdict they should
render for that degree. They are next charged that, if they
should not be satisfied, beyond a reasonable doubt, that the
accused was guilty of murder in the first degree, they should
find her guilty of murder in the second degree, and proceed to
assess the penalty, &c. It must be obvious to every mind,
capable of comprehending the simplest truths, that these instruc-
tions, with reference to the degrees of murder, were only to be
considered, after the jury had determined that the accused was
guilty of murder. Indeed, the direct effect of the instructions

was, that the jury were not at liberty to consider the degrees of murder, until they had determined that she was guilty of murder, in some degree.

It was not error, then, to charge the jury after they had found the accused guilty of murder, and that she was *not* guilty of murder in the first degree, that they should find her guilty of murder in the second degree.

It is also insisted, by the appellant, that there "were no facts in the case to have demanded of the court a charge in relation to murder in the second degree, and that it was error to give it, and calculated to mislead the jury." The law is, "if the jury shall find any person guilty of murder, they shall also find, by their verdict, whether it is of the first or second degree." (Amendments to Code Crim. Proc., Art. 609.) It may be asked, how could this law be complied with, or how could the jury know the distinction between the degrees of murder, without being informed by the charge of the court? It would seem, therefore, that the charge in relation to the degrees of murder, was not only proper, but made imperative by the law.

But independently of the fact, that the law made it necessary to charge in relation to the degrees of murder, it cannot be denied, that there was proof tending to show that the accused might have committed the murder under circumstances that would properly reduce the grade of the offence to murder in the second degree. The jury had the right to consider whether, under all the facts proved in the case, the accused was guilty of murder in the first or second degree, and it matters not by what process of reasoning they attained their conclusion, or what constituted the basis of that reasoning; in the language of the presiding judge, "They had the power to find guilty in the second degree," and with that exercise of power, whether morally right or wrong, the court very properly refused to interfere.

There is no analogy between this case and the case of Pilkington v. The State, 19 Texas Rep. 214, cited by appellant. That case was reversed, because the character of the verdict indicated first, that the jury was misled by the refusal of the court to ex-

plain the *intent* necessary to constitute the offence, and secondly, that it was *in fact a compromise verdict*. It cannot be, that the jury in this case was misled by a charge, in all respects proper, nor does the verdict itself show that it was the result of a compromise. There is, on the contrary, evidence of record in regard to the manner in which the verdict was found, negativing the idea that it was a compromise. The conclusion is, that the judge rightly overruled the motion for a new trial, based upon this ground.

It is also insisted by the appellant, that the court erred in overruling the motion for a new trial, on the seventh ground set forth in the motion, to wit: "Because two of the jurors had expressed an opinion adverse to the defendant in this case, before being empannelled, which fact was, at the time, unknown to the defendant."

The ground itself involves a mistake of fact. There was no proof to show that the juror, Littlefield, who was embraced in the objection, had ever, at any time, expressed an opinion, either adverse or favorable to the accused, or expressed an opinion as to her guilt. Nor does it appear that Dunn, the other juror embraced in the motion, ever expressed an opinion that the accused was guilty of the charge then pending against her. The only testimony, having the slightest bearing on the question, is that of the witness Lee, who testified, that some days before the trial, witness was in company with the two jurors mentioned, "when Mrs. Monroe passed along; that he, witness, said to Dunn, in a joke, or light way, that he thought she ought to be hung, and Dunn said, yes, she ought to have been hung twenty years ago. They were not conversing of the case—it was a jocular conversation." Now, if the objection to the juror, growing out of this conversation, is entitled to any consideration at all, it may be said, that the most important inference that can be drawn from the conversation is, that the juror had no very favorable opinion of the general character of the accused ; and surely it will hardly be insisted, that a juror, who has a bad opinion of the general character of an accused person, is thereby disquali-

fied, as a juror, from sitting in his case; or even if that should be true, that it should be a good cause for setting aside a verdict, after it is rendered. If that be the true doctrine, the worst men of a community can always, with the greatest facility, set aside verdicts against them, and may take advantage of the odiousness of their own character to do so.

But what has been said on this subject, has been upon the hypothesis, that the mode adopted in this case, of impeaching the qualification of a juror, is legitimate, which is not by any means admitted as a fact. Such a practice would lead necessarily to the greatest confusion, and render every verdict insecure, until every effort was exhausted to show that one or more of the jurors was disqualified to try the case. This court has frequently reprobated the practice of receiving the affidavit of a juror, going to show the misconduct of himself, or fellows, " as leading to improper tampering with the jurors, to procure such affidavits after verdict." (Mason v. Russell's Heirs, 1 Texas Rep. 721.) For similar reasons, the practice proposed in this case would be equally reprehensible.

The only qualifications required for a juror, under our criminal law, are to be found in Art. 576, Amendments Code Crim. Proc. The test of these qualifications, is the juror's own oath. (Id. Art. 577.) In this case, the jurors, who, it is alleged, were disqualified, made oath that they had no " bias or prejudice in favor of, or against, the defendant; and that they had no established conclusion in their minds, as to the guilt or innocence of the defendant, that would influence their verdict." Certainly, this test should weigh as much, as the testimony of a single witness against it, and when this testimony proves nothing but a vague declaration made by the juror, in a jocular conversation, having no reference to the case to be tried.

The sixth ground of the motion for a new trial is, that the " verdict was decided by lot, and was not, in fact, a fair expression of opinion by the jurors." The definition of the word lot is, " chance, hazard, fortune." The very signification of the word, in connexion with the facts proved to establish this ground,

sufficiently refutes the proposition, and leaves nothing for me to add, to justify the ruling of the court.

ROBERTS, J.—The main ground of error relied on, is in refusing a new trial, because the verdict was not warranted by the evidence.

The evidence is conflicting in its tendencies, and imposed on the jury the necessity of both determining upon the credibility of the witnesses, and of reconciling the facts, as best they could. The exculpatory testimony was given, mainly, by Coombs and Sweeny; the former, a man hired to work by defendant, and the latter, her son, about fourteen years of age.

Their evidence, intrinsically considered, may be liable to objection. Without entering into an extended discussion of the facts, which would authorize the jury not to attach great importance to their testimony, it will suffice to advert to one circumstance in connexion with it. They profess to have been about the house of defendant during the day the girl died, and to be cognisant, generally, of what was going on in relation to her. They give no account of her being whipped on that evening, nor do they account, in any credible manner, for the cries of distress that were uttered there. That this girl was whipped, and that by the defendant, or with her assent, on that evening, there can be, as we believe, no shadow of doubt. The stripes found on her back; the cries and altercation heard by Purvis, so distinctly, at a considerable distance, and which were heard, though not so distinctly detailed, by another witness, force the mind to the conclusion that it did take place; and that, being once established, the exculpatory influence of Coombs' and Sweeny's testimony is destroyed. What was she being whipped for, after it was known that she had taken poison? That question cannot be answered, when considered in reference to the desperate ill-will, and brutal treatment of defendant towards this girl, habitually exercised, otherwise than by implicating her in the guilt of the murder of this girl. Upon that proposition, the mind of the jury could rest satisfactorily. As to what were her purposes in doing

or instigating the deed, and as to how it was done, the mind may possibly hesitate as to a definite conclusion. And hence, the charge given by the court, as to murder in the second degree, was not inappropriate; and hence, also, we may account for the jury having found her guilty of murder in the second degree.

As to the objection taken to the charge, that it was calculated to mislead the jury, by requiring them to find the defendant guilty of murder, if not of the first, certainly of the second degree, we are of opinion, that it is not well taken. The court had, with great precision and clearness, instructed the jury as to the character of doubt that should acquit the defendant altogether; and also, that would reduce the homicide from murder in the first, to murder in the second degree. And after having done this with such manifest care, the jury could hardly have believed, or suspected, from the clause in the charge objected to, that the court was undertaking to determine for them that there was no doubt in the case, upon which they could rest an acquittal. Experience of criminal trials shows, that juries in this country are not ready in suspecting that their legitimate powers are attempted to be taken away from them; nor are they any more ready to yield to an improper usurpation, had it been attempted. We think, in this case, it was neither done, nor attempted to be done; but, on the contrary, that no reasonable men, who might have been empannelled to try the cause, could have inferred, in the slightest degree, from the charge, that they were not at liberty to find the defendant not guilty of any offence, if the facts dictated that verdict to their judgment and consciences.

As to the juror, White, who was pronounced to be competent by the court, we do not think he had formed that sort of opinion, as that the court could adjudge that he was disqualified. (Code Crim. Proc., Art. 579.)

A ground of the motion for a new trial is founded on an expression of Dunn, one of the jurors, made by him before the trial, that "he thought she, (defendant,) ought to have been hung twenty years ago." This, as it appears, was prompted by a remark made

by the witness, upon her passing by them, that he, (witness,) thought she ought to be hung. It was said in a loose, jocular way, and so far as the juror was concerned, had no reference to this case. If taken to have been seriously made, it conveys the general idea, entertained by him, that she was a very bad woman. Such general idea is not, necessarily, a ground of disqualification; if it were, notoriously bad men never could be tried, for want of qualified jurors.

After a careful examination of the record, we find nothing in the evidence of the physicians and other witnesses for the state, upon which the verdict is based, which is calculated to raise a suspicion of their integrity, or intelligence, in reference to the matters of which they speak; we find nothing in the mode adopted of finding a verdict, at all objectionable; we find nothing in the charge objected to, calculated to produce a wrong impression; and have no reason to believe, that the defendant did not have a fair trial in every way, and was fairly convicted, while being fully, and doubtless ably, defended, by counsel of her own selection.

Judgment affirmed.